[Cite as *In re B.S.*, 2018-Ohio-4645.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
PIKE COUNTY

| | | |
|---|---|---|
| In Re: B.S. | : | |
| W.S. | : | |
| J.S. | : | Case No. 18CA890 |
| | : | |
| | : | <u>DECISION AND</u> |
| Adjudicated Neglected and | : | <u>JUDGMENT ENTRY</u> |
| Dependent Children | : | |
| | : | RELEASED 11/09/2018 |

<u>APPEARANCES:</u>

Matthew F. Loesch, Portsmouth, Ohio, for appellant.

Elisabeth M. Howard, Waverly, Ohio, for appellee.

Matthew P. Brady, Grove City, Ohio, Guardian ad Litem for the minor children.

Hoover, P.J.

{¶1} T.S., the children's biological mother, appeals the trial court's judgment that awarded Pike County Children Services Board ("PCCSB" or "the agency") permanent custody of her three children: ten-year-old B.S.; eight-year-old W.S.; and six-year-old J.S. For the reasons that follow, we affirm the trial court's judgment.

## I. Statement of Facts and Procedural Posture

{¶2} The three children have not lived with their mother in over three years. Between January 2015 and February 2017, the children were placed in the temporary custody of Scioto County Children Services ("SCCS"). In February 2017, the children were placed in the legal custody of their paternal grandparents. Shortly thereafter, PCCSB became concerned for the children's well-being and enacted two alternative response plans. The alternative response plans

were not successful. Thus, in November 2017, the agency requested and received emergency custody of the children.

{¶3}    The agency later filed complaints that requested temporary custody of the children. A short time later, the agency amended its complaints to request permanent custody of the children. The agency alleged that it had received a report that indicated the following: (1) B.S. has escalating "severe behavior issues" (2) the grandparents had been unable to control the behavior; (3) school personnel noted the presence of bed bugs and roaches on the children's book bags; (4) the children repeatedly wore dirty and ill-fitting clothes; (5) B.S. expressed suicidal ideations and adamantly declared that "he would hurt himself if he had to return home;" and (6) the grandparents' home conditions "are deplorable."

{¶4}    On January 30, 2018, the court adjudicated the children neglected and dependent. The court set the matter for a permanent custody hearing to be held on February 15, 2018. Due to the failure to perfect proper service upon certain witnesses, the court later continued the hearing date to April 2018.

{¶5}    At the start of the hearing, the mother's counsel requested a continuance of the permanent custody hearing. Mother claimed that she had been attempting to retain private counsel and was still trying to do so. She needed more time in order to obtain more funds to hire a lawyer. In response to mother's request, the court questioned her regarding her attempts to retain private counsel. The mother had spoken with an attorney but would not have adequate funds to retain the attorney until June. The court denied the request for the continuance because the children's mental health was at stake, and expenses had already been incurred to subpoena witnesses. The court felt that the matter needed to be resolved.

{¶6}    The agency's first witness, Patricia Cardona, is a child and adolescent psychiatric nurse practitioner and had treated all three children. When Cardona first observed B.S., she thought B.S. would need psychiatric hospitalization. He appeared to be in a state of crisis. B.S. was very aggressive; he was hitting people and was threatening to kill the principals and the teachers. He had also threatened to kill himself.

{¶7}    Cardona explained that she immediately placed B.S. on a powerful antipsychotic medication and that by the next week, he had slightly stabilized. Even though B.S. had slightly stabilized, he continued to be fearful; and he kept hearing a voice that threatened to kill him and his family. In addition, B.S. told Cardona that his grandmother threatened to burn the house down. He also said that the grandmother locked the children in a room all night and threatened to kill herself. As a result, Cardona diagnosed B.S. with post-traumatic stress disorder (PTSD), psychosis, and disruptive behavior disorder.

{¶8}    Cardona prescribed medication to B.S., who responded very well. B.S. began performing well in school, stopped hitting as much, and stopped hearing voices after he was removed from the grandmother's home and placed in the foster home.

{¶9}    With respect to W.S., Cardona saw him in June 2017. W.S. had been hitting other children and cussing. When Cardona encountered W.S. in November 2017, his aggression and agitation was much worse. W.S. had been exposing himself, urinating, and defecating himself because he was afraid to go to the bathroom by himself. Additionally, W.S. had punched a teacher in the face and had broken the teacher's nose. As a result, the school only permitted W.S. to attend half-days.

{¶10}  Cardona diagnosed W.S. with attention deficit hyperactivity disorder (ADHD), PTSD, generalized anxiety disorder, and a sleep disorder. She prescribed medication for him and

he made progress. After taking the medication, W.S. no longer displayed aggression, did not hit his siblings as much, and no longer had bathroom issues. The school then allowed W.S. to attend full days of school.

{¶11} As for J.S., Cardona first encountered J.S. in May 2016. At that time, she diagnosed him with ADHD and oppositional defiant disorder. J.S. had been hitting other children at preschool. J.S. had told Cardona "that he was the one who was supposed to have been beaten" and that he "was worried about his mom." J.S. informed Cardona that the mother's boyfriend "hit [him] in the neck with the belt."

{¶12} Cardona explained that she recently diagnosed J.S. with PTSD, ADHD, psychosis, and a sleep disorder. Cardona stated that J.S. still sees "monsters and clowns at night," but he does not hit as much and is otherwise improving.

{¶13} Cardona opined that the children need a stable environment in order to have any chance of success. Cardona related that even in a stable environment, her prognosis for the children would be "guarded." But, she further observed that since the children have been in foster care, their behaviors have stabilized. Steadfast in her beliefs, Cardona would not recommend any "unsupervised contact with any family member." Cardona believed that returning the children to the environments that led to their diagnoses could reignite their problems.

{¶14} Another witness, Kelly Montovan, was a care coordinator at Shawnee Family Health Center. She first encountered the family in 2015. At that time, the mother "appeared to be a good parent" but had fallen into an abusive relationship. Montovan explained that in January 2015, the mother sought help after the mother's boyfriend hit J.S. The mother agreed to temporarily relinquish custody to SCCS until the mother moved out of the home she shared with

her boyfriend. Montovan stated that the mother left and went to live in a shelter; but the mother did not end the relationship. Montovan observed that the mother had a " hard time standing on her own two feet" and agreed that the mother would involve herself in unhealthy relationships for herself and her children.

{¶15}   Montovan explained that she next encountered the children in the summer of 2017, when the children lived with the paternal grandparents. The school had been reporting that W.S.'s "behaviors were out of control." W.S. "was hitting, kicking, [and] * * * running from the teachers." B.S. also displayed "a lot of aggressive behaviors" at school—"cussing, fighting, hitting." Montovan had not noticed similar behaviors before B.S. went to live with the grandparents.

{¶16}   Montovan stated that since the children had been in foster care, their behaviors improved. B.S. especially has "made a lot of improvements." Montovan indicated that when B.S. returned to foster care in November 2017, "he was having daily meltdowns at the school," but he now "seems happy."

{¶17}   Montovan also observed visits between the mother and the children; and they appeared to interact well. She did not notice any issues during the visits; they appeared bonded.

{¶18}   A third witness, SCCS caseworker Naomi Kinsel, had become involved with the family in 2015, after the mother reported that her boyfriend had been abusive to her and J.S. The mother had agreed to a temporary custody order. SCCS developed a case plan that required the mother to complete a parenting program, to find stable housing, to continue mental health services, and to be able to maintain a safe and stable environment for the children.

{¶19}   Kinsel testified that the mother did not complete parenting classes and maintained suitable housing for only "a short time." Kinsel related that in August 2015, the mother returned

to living with her abusive boyfriend. Furthermore, throughout the pendency of the case, the mother's visits with the children became sporadic and SCCS had concerns about the mother's ability to monitor and control the children's behaviors. The children "were very angry" and "were aggressive toward each other." The longer the children stayed in foster care, the more their behaviors stabilized.

{¶20}  Kinsel testified that SCCS discussed filing for permanent custody but ultimately decided to place the children with the paternal grandparents. SCCS continued to have concerns about the mother's stability. One time when Kinsel visited the mother, the mother "had on heavy makeup and there was bruising on her face around one of her eyes." Kinsel did not inquire at the time. A few months later, Kinsel again visited the mother and noticed "a cut underneath * * * one of her eyes that had a couple of stitches." Kinsel asked the mother what happened; and the mother stated that she fell down the steps. Kinsel remained concerned that the mother continued to be a victim of domestic violence.

{¶21}  A fourth witness, PCCSB caseworker Bobbie Jo Dietzel, testified that the agency became involved with the family in May 2017. Dietzel had received a report that W.S. had a bruise on the side of his face and that the grandfather had "punched him." The report also indicated that the children came to school dirty.

{¶22}  Dietzel stated that the agency received a second report in early October 2017. This report declared that the children are "continuously filthy, smell terrible, and have clothing that is worn out, dirty, and doesn't fit." Additionally, bed bugs and cockroaches had been found on the children and their personal belongings. As a result, the agency subsequently enacted a safety plan. The grandparents agreed to clean and sanitize the home within four days, to not allow any animals inside, to eradicate bed bugs and roaches, and to maintain a clean home.

However, the grandparents did not comply with the terms of the safety plan. This prompted the agency to seek emergency custody of the children.

{¶23} When the agency obtained emergency custody of the children, all three children displayed "very out of control" behaviors. B.S. had threatened to kill himself. When she saw the children less than one month later, she could not believe the change in their behaviors. The children appeared "very calm" and "very settled and adjusted to the environment." In her twelve years of employment, Dietzel has not witnessed such a dramatic change in behaviors over a short period of time.

{¶24} Dietzel explained that although the children are adjusting and "doing very well," they still have some issues: they do not like being alone in a room; they do not like to use the bathroom unaccompanied; and they sometimes have nightmares.

{¶25} The next witness, the children's foster mother, testified that the children lived with her from January 2015 through late 2016, when SCCS started to transition the children into the paternal grandparents' home, and again since November 2017. The foster mother explained that during the SCCS case, she transported the children to visits with the mother. The foster mother stated that the mother did not always keep the children for the entire time. Instead, the mother would call the foster mother to pick up the children "because they were just out of control" and the mother "couldn't manage them."

{¶26} The foster mother stated that in November 2017, when PCCSB placed the children in her home, "[t]hey were totally wild" and "[o]ut of control." B.S. was "enraged over everything." All three children have anger issues but have improved while in her care. The children need almost constant supervision. They "love to play fight and wrestle and it always ends up bad."

{¶27}   The mother also testified. In January 2015, she entered into a voluntary custody agreement with SCCS because the children did not "have a stable place" and because she had been in "an abusive relationship." Her boyfriend hit the youngest child, J.S., with a "belt buckle upside his neck."

{¶28}   For the past three or four years, she had been undergoing mental health treatment for "anxiety disorder." The permanent custody hearing was stressful for the mother because she has "anxiety and stuff and [she] can't handle all this." Despite her anxiety disorder, the mother believed that she was still very capable of taking care of the children. She admitted, however, that when the children were in SCCS's temporary custody, she once called the foster father to pick up the children from a visit due to "anxiety." The mother further admitted that she often cut her visits with the children short. She was not able to handle the children—she "had a lot going on in [her] life then." The mother explained that she "was messed up in the head" and "had a lot of anxiety going on." The mother indicated that she still was living with her abusive boyfriend because she "was scared to live by [her]self" and "[t]hat's why [she] wanted her kids back."

{¶29}   The mother stated that when the paternal grandparents had legal custody of the children, the grandparents were supposed to bring the children to visit her every Sunday. She claimed that the grandparents did not always bring the children and that she saw the children "[p]robably twice a month." When the children visited, the children "were good," but they were "always dirty." The mother stated that the children "always had dog feces on their shoes and their clothes stunk like animals." The mother stated that she did not bring the children's cleanliness to the grandparents' attention because she "was afraid" and she "wanted to do it legally."

{¶30}   The mother lived in the same residence for approximately two years. The residence had two bedrooms but did not contain enough beds for all of the children. The mother related that although she has not visited with the children for a "few months," she filed a motion with the court to try to obtain visits.

{¶31}   On June 7, 2018, the trial court granted the agency permanent custody of the three children. The court found that (1) the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, (2) the children were in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period, and (3) placing the children in the agency's permanent custody is in their best interests.

{¶32}   The trial court found that R.C. 2151.414(E)(1) applied to both the mother and the father: "[F]ollowing placement outside the home for nearly two years in the case with Scioto County Children Services and after more than five (5) months in the custody of PCCSB, parents have been unable or unwilling to remedy the conditions that caused removal." The court determined that neither parent has suitable housing and both "failed to remedy the issues that caused legal custody to be given to paternal grandparents after two years in the custody of [SCCS]."

{¶33}   The trial court explained that the mother continues to struggle with mental health issues. The court was concerned that mother's main reason for wanting the children back with her was so that she would not be alone. Additionally, the court noted that the mother had not actually taken care of the children for a full twenty-four (24) hour period in more than three (3) years. The mother would not even take advantage of her visitation as she would often not

exercise it. In addition, the trial court felt that the mother's housing was not suitable for the minor children, and noted that the mother even denied entry of the caseworker into her home.

{¶34} In addition, the trial court found that mother failed to complete the elements of her case plan from January 2015 to February 2017, and even appeared at the legal custody hearing testing positive for illegal substances. The court found that parents "have failed to remedy the issues that caused the initial removal of the minor children in 2015 and, in fact, still have housing issues well into 2018." The court thus determined that the "children cannot be placed with either parent within a reasonable time and should not be placed with either parent."

{¶35} The trial court further found that R.C. 2151.414(E)(6) applies to the father: in January 2015, he was convicted of child endangerment.

{¶36} Additionally, the children could not be returned to the paternal grandparents' home. The court noted that the children's mental health "has deteriorated severely during the time that they were in the legal custody of the" paternal grandparents. The court found it "very concerning that the children had to be placed on anti-psychotic drugs in order to stabilize and have a somewhat normal life. Additionally, the children's reports of grandmother's threats of suicide and to burn the home down with children in it are very concerning." The court thus concluded "that return to the paternal grandparents would be an immediate and continued danger to the health and welfare of the minor children."

{¶37} The trial court found that the "children have suffered enough." The court noted that the children had been in SCCS's temporary custody for more than two years and that less than three months later, PCCSB received referrals regarding the children's welfare.

{¶38} The trial court next considered whether placing the children in the agency's permanent custody is in their best interests. With respect to the children's interactions and

interrelationships with their parents, the court found that the interaction had been limited. Mother did not exercise all of her visitation; and the father was not having any unsupervised contact with the children. With respect to the grandparents, no evidence was presented that they shared a strong bond with the children. In contrast, the children seemed to have a good bond with the foster parents and have done extremely well in their care.

{¶39} The trial court also considered the children's wishes: "The minor children's Guardian ad Litem submitted a report recommending termination of parental rights and stated that this award was in the best interest of the minor children."

{¶40} Next, the trial court evaluated the children's custodial history. The court noted that they had been in SCCS's temporary custody for approximately two years—from January 16, 2015, through February 16, 2017—and that the children were placed in the paternal grandparents' legal custody between February 2017 and November 3, 2017.

{¶41} The trial court additionally considered the children's need for a legally secure permanent placement and whether they could achieve that type of placement without granting the agency permanent custody. The court found that a legally secure permanent placement "is not possible without termination of parental rights."

{¶42} The trial court did not find any of the R.C. 2151.414(E)(7) to (11) factors applicable.

{¶43} The trial court thus determined that placing the children in the agency's permanent custody was in their best interests and awarded the agency permanent custody of the children.

## II.  Assignments of Error

{¶44} The mother raises two assignments of error:

First Assignment of Error:

> The Trial Court's award of permanent custody of B.S., J.S., and W.S. to
> the Pike County Children Services [Board] was against the manifest
> weight and sufficiency of the evidence.

Second Assignment of Error:

> The Trial Court abused its discretion in denying Appellant's motion for a
> continuance to obtain private counsel.

## III.  Analysis

### A.  Permanent Custody Decision

{¶45}  In her first assignment of error, the mother argues that the trial court's decision to award the agency permanent custody is against the manifest weight of the evidence. The mother asserts that the evidence indicates that she has the ability to care for the children. She thus contends that the trial court incorrectly decided to grant the agency permanent custody of the children.

{¶46}  The agency responds that substantial evidence supports the trial court's decision to award it permanent custody of the children. The agency first notes that the mother does not dispute that the children have been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two month period. The agency additionally asserts that substantial evidence shows that placing the children in the agency's permanent custody is in their best interests.

### 1. Standard of Review

{¶47}  A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *In re R.M.,* 2013– Ohio–3588, 997 N.E.2d 169, ¶ 53 (4th Dist.).

> "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' "

*Eastley v. Volkman,* 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, ¶ 12, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

{¶48} When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " ' " *Eastley* at ¶ 20, quoting *Tewarson v. Simon,* 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *Accord In re Pittman,* 9th Dist. Summit No. 20894, 2002–Ohio–2208, ¶¶ 23–24.

{¶49} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.,* 119 Ohio St.3d 538, 2008–Ohio–4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:

> [T]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes,* 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986). In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). *Accord In re Holcomb,* 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof."). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶50} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.,* quoting *Martin* at 175; *accord State v. Lindsey,* 87 Ohio St.3d 479, 483, 721 N.E.2d 995 (2000).

{¶51} Furthermore, when reviewing evidence under the manifest weight of the evidence standard, an appellate court generally must defer to the fact-finder's credibility determinations. As the *Eastley* court explained:

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Eastley*, 132 Ohio St.3d 328, 2012–Ohio–2179, 972 N.E.2d 517, at ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

### 2. Permanent Custody Principles

{¶52} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed .2d 599 (1982); *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990); *accord In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829, ¶¶ 8-9. A parent's rights, however, are not absolute. *D.A.* at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham,* 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.,* 300 So.2d 54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

### 3. Permanent Custody Framework

{¶53} Although neither the mother nor the agency identifies the appropriate framework for our analysis, we recognize that a children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353(A)(4), or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, the agency sought permanent custody of the children by requesting it in an amended

neglect and dependency complaint. R.C. 2151.353(A)(4) allows a trial court to commit a child to a children services agency's permanent custody as the initial disposition if the court (1) determines under R.C. 2151.414(E) that the child cannot be placed with the child's parents within a reasonable time or should not be placed with the parents, and (2) determines under R.C. 2151.414(D)(1) that permanent custody is in the child's best interest.

{¶54} We observe that during the trial court proceedings, the agency also asserted that R.C. 2151.413(D)(1) governed its request for permanent custody. That provision generally requires a children services agency that has a current temporary custody order to file a motion for permanent custody "if a child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period."

{¶55} In the case at bar, the agency did not file a motion for permanent custody. Instead, the agency sought permanent custody by requesting it as the initial disposition in its amended neglect and dependency complaint. And on appeal, the agency notes that it sought permanent custody as the initial disposition. Because R.C. 2151.413(D)(1) applies to permanent custody motions and not to permanent custody complaints, R.C. 2151.353(A)(4) governs our analysis.

{¶56} The distinction is significant. While both statutes require the agency to show that permanent custody is in a child's best interest, the statutes contain different predicate circumstances. R.C. 2151.413(D)(1) requires that an agency have temporary custody of a child for twelve or more months of a consecutive twenty-two month period and does not require an agency to establish under R.C. 2151.414(E) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Instead, R.C. 2151.413(D)(1) allows the agency to file a motion for permanent custody based solely upon the length of time that the child has been in a children services agency's temporary custody (i.e., the child has been

in an agency's temporary custody for twelve or more months of a consecutive twenty-two month period).

{¶57}   In contrast, R.C. 2151.353(A)(4) does not allow a trial court to grant an agency permanent custody as the initial disposition, unless the court finds under R.C. 2151.414(E) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. Neither R.C. 2151.353(A)(4) nor R.C. 2151.414(E) specifically indicates that the time spent in an agency's temporary custody may serve as a predicate circumstance for granting permanent custody as an initial disposition. Rather, R.C. 2151.353(A)(4) specifies the predicate circumstance as a finding that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent. *See In re J.F.*, 2018-Ohio-96, 102 N.E.3d 1264, ¶ 48 (8th Dist.) (noting that R.C. 2151.353(A)(4) requires finding that child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent); *In re A.A.*, 12th Dist. Clermont No. CA2015-12-098, 2016-Ohio-2992, ¶ 10 (same); *In re Nibert*, 4th Dist. Gallia No. 03CA19, 2004-Ohio-429, ¶ 14 (same).

{¶58}   Having identified the appropriate framework for our analysis, we turn to consider the mother's argument that the trial court's permanent custody decision is against the manifest weight of the evidence.

### a.  R.C. 2151.414(E)

{¶59}   In the case at bar, the trial court found that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent. The trial court determined that under R.C. 2151.414(E)(1), the parents have failed to substantially remedy the conditions that led to the children's 2015 removal in the Scioto County case and that led to their 2017 removal from the grandparents' legal custody. The trial court additionally found that R.C.

2151.414(E)(6) applies to the father due to a prior child endangering conviction. Because the father is not involved in this appeal, we consider the trial court's R.C. 2151.414(E)(1) finding only as it relates to the mother.

{¶60} In determining whether a child cannot be placed with either parent within a reasonable time or should not be placed with either parent, R.C. 2151.414(E) requires the trial court to consider "all relevant evidence" and outlines the factors a trial court "shall consider." If a court finds, by clear and convincing evidence, the existence of any one of the listed factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." As relevant in the case at bar, R.C. 2151.414(E)(1) provides as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶61} "The focus of R.C. 2151.414(E)(1) is on the efforts made to remedy the problems *after* the child is removed from the home." (Emphasis sic.) *In re Ward*, 4th Dist. Scioto No. 99CA2677, 2000 WL 1074070, *5 (Aug. 2, 2000); *accord In re B.C.-1*, 4th Dist. Athens Nos. 14CA43, 14CA48, 2015-Ohio-2720, ¶ 44. "R.C. 2151.414(E)(1) applies only if the parent's conduct after the child's removal in the current case shows that the parent continuously and repeatedly failed to substantially remedy the conditions that caused the child to be placed outside his or her home." *B.C.-1* at ¶ 44. R.C. 2151.414(E)(1) thus requires the agency to provide both a

case plan and time to remedy the cause of the children's removal from the home. *In re B.E.M.*, 9th Dist. Wayne No. 04CA0028, 2004-Ohio-4959, ¶ 13; *In re Lewis,* 4th Dist. Athens No. 03CA12, 2003–Ohio–5262, ¶ 24; *In re T.K.,* 9th Dist. Wayne No. 03CA0006, 2003–Ohio–2634, ¶ 13.

{¶62} However, we previously have held that children services agencies do not have a general duty to provide a case plan aimed at reunification after filing a permanent custody complaint. *Ward* at *4; *accord In re Lewis* at ¶ 23. In *Ward,* we noted that " '[i]t is axiomatic that a parent's statutory right to a reunification plan does not apply in the context of actions seeking permanent custody.' " *Id.,* quoting *In re Cooperman,* 8th Dist. Cuyahoga No. 67239, 1995 WL 23162, *4 (Jan. 19, 1995). Thus, a trial court "can award permanent custody to a children services agency even though little or no efforts are made to return the child to his or her home if the evidence supports a finding that it is in the child's best interest and that the child should not be returned to the parents." *Id.*

{¶63} Nevertheless, if R.C. 2151.414(E)(1) is the basis for the permanent custody award, then the children services agency must develop a case plan aimed at reunification. *In re Allbery,* 4th Dist. Hocking No. 05CA12, 2005–Ohio–6529, ¶ 25. While "an agency need not give every parent an opportunity to correct the situation that caused the removal of their children", "if the agency seeks to argue that the parent did not rectify the causes for removal, then it must have given the parent a case plan and opportunity to do so." *In re James C.*, 6th Dist. Lucas No. L-98-1258, 1999 WL 628685, *7 (Aug. 20, 1999).

{¶64} Consequently, although an agency ordinarily need not establish a case plan aimed at reunification when seeking permanent custody as the initial disposition, if the agency intends to rely upon R.C. 2151.414(E)(1), it must do so. Without a case plan and time to correct the

situation which caused the removal of the children before the agency filed for permanent custody, a finding under R.C. 2151.414(E)(1) cannot be sustained. *In re Destiny C.*, 6th Dist. Lucas No. L-08-1147, 2008-Ohio-5292, ¶ 22; *accord In re Nibert*, 2004-Ohio-429, at ¶ 29.

{¶65} "Furthermore, a case plan relating to a prior matter cannot be used to satisfy [R.C. 2151.414(E)(1)] where the agency seeks permanent custody as the initial disposition." *Ward* at *5. Thus, "when there is a new and independent complaint that requests an initial disposition of permanent custody, reliance on the R.C. 2151.414(E)(1) factor is error." *Destiny C.* at ¶ 25.

{¶66} In the case sub judice, the trial court incorrectly determined that R.C. 2151.414(E)(1) applied. The agency sought permanent custody as the initial disposition, but it did not develop a case plan aimed at reunification and did not give the mother time to correct the situation that led PCCSB to remove the children from the grandparents' legal custody. Although the trial court relied upon the mother's prior case plan with SCCS, our cases have consistently stated that R.C. 2151.414(E)(1) applies only if the parent's conduct after the child's removal in the current case shows that the parent continuously and repeatedly failed to substantially remedy the conditions that caused the child to be placed outside his or her home. *E.g., B.C.-1* at ¶ 44; *Allbery* at ¶ 25. Thus, even if the mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of her home during the 2015-2017 Scioto County court proceedings, the evidence does not show that the mother continuously and repeatedly failed to substantially remedy the conditions that caused the children to be placed outside of her home during the current court proceedings. Consequently, R.C. 2151.414(E)(1) does not support the trial court's finding that the children cannot be placed with the mother within a reasonable time or should not be placed with the mother.

{¶67} Although the trial court improperly relied upon R.C. 2151.414(E)(1), we "must nevertheless affirm the judgment if it is legally correct on other grounds." *Gulbrandsen v. Summit Acres, Inc.*, 2016-Ohio-1550, 63 N.E.3d 566, ¶ 41 (4th Dist.). Indeed, the Supreme Court of Ohio has long-recognized that appellate courts " 'will not reverse a correct judgment merely because of an erroneous rationale.' " *Johnson v. Moore*, 149 Ohio St.3d 716, 2017-Ohio-2792, 77 N.E.3d 967, ¶ 7, quoting *State ex rel. Gilmore v. Mitchell,* 86 Ohio St.3d 302, 303, 714 N.E.2d 925 (1999) (concluding that although lower court incorrectly dismissed habeas corpus petition on basis of res judicata, dismissal was nevertheless proper when petition failed to state a claim); *In re G.T.B.*, 128 Ohio St.3d 502, 2011-Ohio-1789, 947 N.E.2d 166, ¶ 7.

{¶68} In the case at bar, although the trial court incorrectly relied upon R.C. 2151.414(E)(1) to support its finding that the children cannot be placed with the mother within a reasonable time or should not be placed with the mother, we believe that the trial court's finding is legally correct on other grounds. R.C. 2151.414(E)(16) permits a trial court to consider "[a]ny other factor the court considers relevant" when evaluating whether a child cannot be placed with a parent within a reasonable time or should not be placed with a parent.

{¶69} Here, the trial court pointed out that during the nearly three-year period after SCCS first obtained temporary custody of the children, the mother continued to experience anxiety and her anxiety sometimes caused her to shorten visits with the children. Furthermore, at the permanent custody hearing, the mother admitted that she continues to struggle with anxiety. The evidence also shows that the mother believed the paternal grandparents did not provide the children with adequate care; yet she took no action in an attempt to allay her fears.

{¶70} More importantly, the court emphasized that (1) all three children suffer from serious behavioral and mental health issues as a result of the mother's past domestic-violence

victimization and as a result of the paternal grandmother's behavior, and (2) the children's issues significantly worsened when in the grandparents' custody but vastly improved when placed in the stability of the foster home. The trial court could have concluded that the children's fragile mental states and dire need for permanency, coupled with the mother's past history and untested ability to control her anxiety in the face of three challenging young children, require a finding that the children should not be placed with the mother. To this end, we note that the permanent custody statutes do not contemplate holding children in custodial limbo while experimenting with their welfare:

> "* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm."

*In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 48, quoting *In re Bishop*, 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987).

{¶71} In the case at bar, the children's mental and behavioral issues currently are under control. The children's nurse practitioner stated that the children need permanency and stability in order to have a modicum of success. Subjecting them to a possible trial placement with the mother, who may or may not possess the skill-set to address the children's serious mental and behavioral needs, seems an unwarranted risk that could force the children into even deeper emotional distress.

{¶72} For all of the foregoing reasons, the trial court could have quite reasonably found that under R.C. 2151.414(E)(16), the children cannot be placed with the mother within a reasonable time or should not be placed with the mother. *See generally Matter of T.S.*, 2017-

Ohio-482, 85 N.E.3d 225, ¶ 9 (2d Dist.) (concluding that although trial court did not cite applicable R.C. 2151.414(E) factor, review of record supported finding under R.C. 2151.414(E)(16)). Therefore, we do not believe that the trial court's finding that the children cannot be placed with the mother within a reasonable time or should not be placed with the mother is against the manifest weight of the evidence.

### b. Best Interest

{¶73} R.C. 2151.353(A)(4) next requires a trial court to consider the factors specified in R.C. 2151.414(D)(1) and evaluate whether placing a child in a children services agency's permanent custody is in the child's best interest.

{¶74} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶75} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513,

857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP–590 and 07AP-591, 2008-Ohio-297, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 3d Dist. Marion Nos. 9–15–37, 9–15–38, and 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 66, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

{¶76}  In the case at bar, as we explain below, we do not believe that the trial court's best-interest determination is against the manifest weight of the evidence.

### i. Children's Interactions and Interrelationships

{¶77}  The evidence shows that the children share a bond with their mother. Additionally, the agency did not raise any concerns regarding the mother's physical interaction with the children during visitations. However, the mother sometimes shortened her visits with the children. Furthermore, the mother has not had any overnight visits with the children in approximately three years. We also note that when the children lived with the mother, the mother maintained a relationship with an abusive boyfriend and the children witnessed the violence inflicted upon their mother, which partially led to at least J.S.'s PTSD diagnosis. Therefore, even though the mother and the children may share a bond and interact well during visitations, the mother's overall behavior has negatively influenced her children.

{¶78} The paternal grandparents did not adequately care for the children. The grandmother locked the children in a room, and threatened to burn down the house and kill herself. The grandparents' home condition was "deplorable," and the children often appeared unsanitary. The children's behaviors were out of control. The evidence thus suggests that the children did not experience positive interactions and interrelationships with the paternal grandparents.

{¶79} In contrast, the children have improved while in the foster family's care. The foster family provides them with proper care and ensures that their mental and behavioral issues are addressed.

### ii. Children's Wishes

{¶80} The trial court did not indicate whether it attempted to directly ascertain the children's wishes. Instead, the court observed that the guardian ad litem recommended that the trial court award the agency permanent custody of the children. *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 32 (noting that R.C. 2151.414 permits the court to consider the child's wishes as the child directly expresses or through the guardian ad litem).

### iii. Custodial History

{¶81} In January 2015, the mother voluntarily placed her children in SCCS's custody. The children remained in SCCS's temporary custody until February 2, 2017. They spent the next nine months in the paternal grandparents' legal custody. In November 2017, PCCSB obtained emergency custody of the children. Thus, when PCCSB filed its permanent custody complaint, the children had been in a children services agency's temporary custody for more than twelve months out of a consecutive twenty-two month period.

### iv. Legally Secure Permanent Placement

{¶82} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal,* 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.,* 10th Dist. Franklin Nos. 15AP–64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.,* 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.,* 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56. Furthermore, a trial court that is evaluating a child's need for a legally secure permanent placement and whether the child can achieve that type of placement need not determine that terminating parental rights is "not only a necessary option, but also the only option." *Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, at ¶ 64. Rather, once the court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.*

{¶83}  Here, the evidence shows that the children's mental health demands a stable, secure, and permanent environment and that they cannot achieve this type of placement without granting the agency permanent custody. The mother has not established a permanent environment appropriate to the children's behavioral and mental needs. The children require intensive supervision and consistent medication to control their behaviors. The trial court found that the mother has her own mental health issues and does not believe she is equipped to appropriately respond and adjust to the children's significant behavioral issues. The evidence illustrates that the children's behavioral and mental health is too fragile for experimentation and that keeping them in a state of limbo in order to allow the mother to demonstrate that she is willing and able to address their needs would be detrimental to their overall health and stability. Even the mother recognized that the children's behavioral issues stem from being "placed here and there and everywhere."

{¶84}  The paternal grandparents showed that they are unwilling or unable to provide the children with an adequate permanent placement. The paternal grandparents neglected the children's physical and emotional needs, and the grandmother inflicted emotional abuse upon the children. The children's behaviors significantly worsened when in the paternal grandparents' custody.

{¶85}  The foregoing evidence shows that the children need a legally secure permanent placement and that placing the children in the agency's permanent custody will provide them with this type of placement.

### v. R.C. 2151.414(E)(7)–(11)

{¶86}  The trial court found none of the R.C. 2151.414(E)(7)-(11) factors applicable.

### vi. Balancing

{¶87}   In light of the foregoing, we do not believe that the trial court's best interest

determination is against the manifest weight of the evidence. The children have experienced

emotional abuse and suffer various mental health ailments, including PTSD as a result of the

emotional abuse. Returning them to an environment with any potential for further emotional

abuse is not in their best interest and would surely worsen their fragile, yet stabilized, conditions.

Instead, the children's best interests demand the assurance of a permanent placement, which can

only be achieved by placing them in the agency's permanent custody.

{¶88}   Consequently, we disagree with the mother that the trial court's decision to award

the agency permanent custody of the children is against the manifest weight of the evidence.

### B. Motion to Continue

{¶89}   In her second assignment of error, the mother argues that the trial court abused its

discretion by overruling her motion to continue the April 2018 permanent custody hearing. She

contends that the trial court abused its discretion by denying her motion to continue based upon

the court's belief that granting a continuance would place the case beyond the statutory time

frame.[1]

{¶90}   "The determination whether to grant a continuance is entrusted to the broad

discretion of the trial court." *State v. Conway*, 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d

---

[1]   The court explained its rationale for denying the mother's motion to continue as follows:

> The Court denied this request based upon the fact that permanent custody motion
> had already been pending since November 30, 2017 and Mother stated that she
> would be unable to hire private counsel until June 2018. Pursuant to the Ohio
> Revised Code, this case must be decided within two hundred (200) days of the
> date of filing, which would be June 18, 2018. A continuation to June of 2018 is
> impossible and would place the Court's decision outside of the statutory time
> frame. Additionally, Mother had been aware of this hearing date since February
> 15, 2018.

996, ¶ 147, citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus. Consequently, " '[a]n appellate court must not reverse the denial of a continuance unless there has been an abuse of discretion.' " *State v. Jones*, 91 Ohio St.3d 335, 342, 744 N.E.2d 1163 (2001), quoting *Unger* at 67. " '[A]buse of discretion' [means] an 'unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken.' " *State v. Kirkland,* 140 Ohio St.3d 73, 2014–Ohio–1966, 15 N.E.3d 818, ¶ 67, quoting *State v. Brady,* 119 Ohio St.3d 375, 2008–Ohio–4493, 894 N.E.2d 671, ¶ 23. "An abuse of discretion includes a situation in which a trial court did not engage in a ' "sound reasoning process." ' " *State v. Darmond,* 135 Ohio St.3d 343, 2013–Ohio–966, 986 N.E.2d 971, ¶ 34, quoting *State v. Morris,* 132 Ohio St.3d 337, 2012–Ohio–2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The abuse-of-discretion standard is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court. *Darmond* at ¶ 34.

{¶91}   The Supreme Court of Ohio has adopted a balancing approach that recognizes "all the competing considerations" courts should consider when determining whether a trial court's denial of a motion to continue constitutes an abuse of discretion. *Unger* at 67. In exercising its discretion, a trial court should "[w]eigh[] against any potential prejudice to a defendant * * * concerns such as a court's right to control its own docket against the public's interest in the prompt and efficient dispatch of justice." *Id.* A court also should consider: (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the

defendant contributed to the circumstance which gives rise to the request for a continuance; and (6) other relevant factors, depending on the unique circumstances of the case. *Id.; State v. Conway,* 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996, ¶ 147; *State v. Jordan*, 101 Ohio St.3d 216, 2004–Ohio–783, 804 N.E.2d 1, ¶ 45. Furthermore, "[o]n review we must look at the facts of each case and the defendant must show how he was prejudiced by the denial of the continuance before there can be a finding of prejudicial error." *State v. Broom*, 40 Ohio St.3d 277, 288, 533 N.E.2d 682 (1988). Additionally, with respect to the continuance of juvenile court hearings, Juv.R. 23 provides that "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties."

{¶92} In the case at bar, we do not believe that the trial court abused its discretion by overruling the mother's motion to continue the permanent custody hearing. Even if we agreed with the mother that the trial court's judgment entry cited an incorrect rationale for denying her motion, the record otherwise shows that the trial court reasonably could have concluded that continuing the matter so that the mother could retain a private attorney was not "imperative to secure fair treatment."

{¶93} While the mother's requested two-month-delay was not overly long, the trial court specifically found, on the record at the permanent custody hearing, that the children's mental health requires an end to their custodial limbo. The trial court thus reasonably could have determined that any further delay to the proceedings would be detrimental to the children's mental health.

{¶94} Moreover, the court originally set the permanent custody complaint for a February 2018 hearing, yet it continued the matter due to witness-unavailability. Thus, the court already

had continued the case once. The court also found that continuing the hearing would inconvenience witnesses.

{¶95}  Finally, we note that the mother has not alleged that she suffered prejudice as a result of the trial court's decision to deny her motion to continue. The mother does not argue that continuing the hearing would have permitted her to refute the agency's evidence that (1) the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (2) the children's best interest require a grant of permanent custody to the agency. Furthermore, the mother was represented by appointed counsel at the hearing, and was not completely devoid of counsel.

{¶96}  Accordingly, based upon the foregoing reasons, we overrule the mother's second assignment of error.

## IV.  Conclusion

{¶97}  Having overruled the mother's two assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

**JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Pike County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J.: Concurs in Judgment and Opinion.
Harsha, J.:     Concurs in Judgment and Opinion as to Assignment of Error I; Concurs in Judgment Only as to Assignment of Error II.


For the Court

By:_____
      Marie Hoover, Presiding Judge


**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.