[Cite as *In re Y.H.*, 2023-Ohio-4554.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: Y.H. AND B.H. | : | APPEAL NO. C-230472 |
| | | TRIAL NO. F10-231Z |
| | : | |
| | | *O P I N I O N.* |
| | : | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 15, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Patsy Bradbury*, Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller*, Hamilton County Public Defender, and *Megan E. Busam*, Assistant Public Defender, Guardian Ad Litem for the Minor Children,

*Christopher Kapsal*, for Appellant Father.

**KINSLEY, Judge.**

{¶1} Defendant-appellant B.H., Sr., ("Father") appeals the judgment of the Hamilton County Juvenile Court granting permanent custody of his children, Y.H. and B.H., to the Hamilton County Department of Job and Family Services ("HCJFS"). Father asserts that the juvenile court erred and abused its discretion in finding that the grant of permanent custody to HCJFS was in the best interest of the children. Father further argues that the grant of permanent custody was not supported by sufficient evidence and was against the manifest weight of the evidence. After a careful review of the record and relevant case law, we affirm the judgment of the juvenile court.

### *Procedural Posture*

{¶2} This case comes before the court for the second time. In Father's first appeal, we held that the juvenile court abused its discretion in awarding permanent custody of the children to HCJFS without conducting an independent review under Juv.R. 40(D)(4)(d). We remanded the matter to the juvenile court to independently review and consider the transcripts before issuing a decision. *See In re Y.H.*, 1st Dist. Hamilton No. C-230132, 2023-Ohio-2272. In this appeal, Father once again challenges the juvenile court's grant of permanent custody, raising new arguments not previously pursued in his first appeal.[1]

### *Factual Background*

{¶3} We summarized the relevant facts regarding Father, Y.H., and B.H. in Father's first appeal. *Id.* at ¶ 3-28. We do so again here.

---

[1] Mother was not a party to the previous appeal and is not a party to this appeal.

*Y.H.*

**{¶4}**   Father is the parent of both Y.H. and B.H.  Y.H. is the older of the two children and was born in May 2020, prematurely.  Two days before Y.H.'s birth, T.W. ("Mother") tested positive for cocaine.  Y.H. did not test positive for any chemical substances when she was born, but there were concerns about her exposure to cocaine due to Mother's test results.  Y.H. spent the first three months of her life in the neonatal intensive care unit ("NICU") and has significant medical needs.

**{¶5}**   From the start, there were concerns about both parents' ability to parent Y.H.  For example, when asked to consent to a nasal gastronomy tube ("g-tube") for Y.H., both parents initially declined, believing that Y.H. would learn to eat on her own.  However, from birth, Y.H. had consistently experienced difficulty feeding arising from her complex medical issues, and the parents' refusal to accept a g-tube was contrary to the advice of the medical professionals.  This created doubts that both parents truly appreciated Y.H.'s medical needs.   In time, however, both parents ultimately consented to Y.H. receiving a g-tube.

**{¶6}**   Father also visited Y.H. while she was in the NICU.  But there were concerns, because Father arrived at the hospital smelling of marijuana during his visits and he visited Y.H. at strange hours during the night.

**{¶7}**   On September 1, 2020, when Y.H. was ready to be discharged from the hospital, HCJFS filed a motion for an interim order of temporary custody with an accompanying complaint for permanent custody. The complaint alleged the following regarding Father:

Hospital staff noticed a heavy smell of marijuana on [Father] when he visited Y.H. in the hospital. The HCJFS has not had consistent contact with him since the birth of the child. He has a warrant for a pending Aggravated Menacing charge (20/CRB/8383). An altercation with [Mother] in 2019 led to an Assault charge (19/CRB/18353) that was eventually dismissed for want of prosecution.

{¶8} Interim temporary custody was granted to HCJFS that same day, and Y.H. was ultimately placed in foster care after being released from the hospital. In the order granting interim temporary custody, the magistrate noted:

HCJFS does not believe that father is appropriate to care for this child, at this time. Father has not made himself available to HCJFS for the purpose of assessment, despite multiple attempts by the agency. Father has two open criminal warrants. HCJFS suspects that father uses marijuana. In 2019, father was charged with an offense of violence against mother.

{¶9} At the time, HCJFS had also sought to obtain permanent custody of Mother's older child, S.L. Father is not S.L.'s parent and therefore was not a party to S.L.'s case. In addition, Mother's parental rights had been terminated regarding her oldest child, D.W., who is also not Father's child. As a result of D.W.'s proceeding, HCJFS filed a motion for a determination that it need not pursue reasonable efforts at reunification of Y.H. with Mother.

{¶10} On October 2, 2020, HCJFS also filed a case plan with the court. The case plan was originally created for S.L. and, as such, Father was not a party to it.

4

Nevertheless, HCJFS removed S.L. from the case plan and added Y.H. and Father as parties.

{¶11}  The case plan required Father to participate in a diagnostic assessment of functioning ("DAF"), participate in a domestic-violence assessment, regularly visit Y.H. in a supervised setting, submit to toxicology screens, and provide proof of income.

{¶12}  On November 25, 2020, HCJFS dismissed and refiled the above paperwork for interim temporary custody and permanent custody due to the dispositional hearing not being held within the required 90-day period after the initial filing. That same day, the magistrate granted the refiled motion for interim temporary custody and the motion for no reasonable efforts regarding Mother.  The parties waived the 90-day requirement for future proceedings.

{¶13}  On January 6, 2021, the juvenile court adjudicated Y.H. dependent and abused.  Regarding Father, the magistrate found that:

> Father is not appropriate to care for [Y.H.].  Father has not bonded with
> [Y.H.], and has not demonstrated an ability to care for [Y.H.]. Father
> has not made himself available to HCJFS for assessment of his fitness
> to care for this child. Father does not have stable housing.  And, father
> has a concerning criminal history.

### *B.H.*

{¶14}  B.H., Father's younger child, was born in September 2021 while Mother was incarcerated on a domestic-violence charge against Father.  B.H. was also born with serious medical issues that require intensive care.

{¶15}  After his birth, HCJFS filed for interim temporary custody of B.H. with an accompanying complaint for permanent custody.  In its request for permanent custody, HCJFS alleged that Father:

> has an extensive criminal history. The agency has ongoing concerns about father's substance use. Father tested positive for cocaine on a drug screen in March 2021. Father failed to appear for nine drug screens. * * * Father admitted to regular use of marijuana. The agency has been unable to assess father's mental health or substance use because he has not participated in a diagnostic assessment despite multiple referrals. Father was previously charged with aggravated menacing against a previous paramour.  Father does not have stable housing or income.

{¶16}  The juvenile court granted interim custody to HCJFS, and B.H. was placed in the same foster home as Y.H.  B.H. was then adjudicated dependent on January 18, 2022.  B.H. was added to the case plan filed on June 1, 2022. The case plan provided Father with reunification requirements nearly identical to that of Y.H.

*Dispositional Hearing*

{¶17}  The permanent-custody hearings for both children were combined and began on April 19, 2022.  On that day, three witnesses testified: (1) Mariah Delaney, (2) Y.H. and B.H.'s foster mother, and (3) Father.

{¶18}  Mariah Delaney was a visitation facilitator for the Family Nurturing Center, the facility where the parents' supervised visits with the children took place. Delaney testified that there had been some issues with visitation, but that most of the issues involved Mother.  She testified that Mother would be combative and would yell at Father.  Delaney described incidents in which Mother kicked Father, Mother cursed

6

in front of the children, and Mother lunged at her. Regarding Father, Delaney testified that Father would try to calm Mother when her behavior escalated. She also testified that Father was receptive to coaching but was not making a lot of progress. However, Delaney also testified that Father was affectionate, attentive, and appropriate with the children during his visits. She explained that Father handled both children well when they would "fuss," but that Father still needed support and occasional intervention.

{¶19} In addition, Delaney testified that both parents had been inconsistent with visitation, had missed several visits, and had been placed on "call-ahead" status due to the number of missed visits. Due to both parents missing three or more consecutive visits, both parents had been removed from the visitation schedule twice. Delaney also testified that Father's need for support and intervention, and his refusal to separate visits from Mother caused his visits to stay at the highest level of supervision.

{¶20} The foster mother of Y.H. and B.H. testified that the siblings had begun bonding. She explained that Y.H. had made great improvements since her brother's arrival. The foster mother testified that Y.H. was in physical therapy, occupational therapy, speech therapy, and had a g-tube. She explained Y.H. had multiple medical appointments and that her g-tube required special training. She also testified that Y.H. had torticollis. Regarding B.H., the foster mother testified that he also suffers from serious medical issues requiring numerous appointments. B.H. attended physical therapy due to concerns about cerebral palsy and torticollis. B.H. was also born with a facial droop, which is monitored. Ultimately, the foster mother testified that she wanted to adopt the children if permitted to do so.

{¶21} Father testified that he had obtained stable, subsidized housing and began living with Mother in February 2022, although they had lived together on and off during the pendency of the case. Father further testified that he was receiving social security, but that HCJFS had not confirmed his job as a mechanic although he maintained he worked as one. Father indicated that he completed a drug screen in March 2021, and that even though his results showed he was positive for marijuana and cocaine, he never used cocaine. Father explained that he only tested positive for cocaine because he was around Mother when she used it. However, Father admitted to using marijuana regularly. Regarding the multiple missed drug screens, Father testified that he missed these screenings due to work and transportation issues. Regarding visits, Father testified that he missed visits due to transportation issues, work, and medical issues, which resulted in him having surgery. Father further testified that he missed his children and wanted them home with him.

{¶22} The dispositional hearing was continued to July 19, 2022. At the second hearing, Crystal Claggett and Mother testified.

{¶23} Crystal Claggett was a supervisor with HCJFS at the time of the hearing but had been a caseworker at the time she became involved in the case. Claggett initially met Mother in 2019 regarding S.L. She testified that Mother had a long history of drug abuse, specifically with cocaine. She testified that Mother's parental rights had been involuntarily terminated twice.

{¶24} Regarding Father, Claggett testified that he admitted to using marijuana consistently. She testified that Father had not participated in any services and had not completed either of the two assessments to which she had referred him. She testified that because there were no completed assessments, HCJFS could not assess Father's

mental health or substance use. Regarding the drug screens, she explained that she sent Father for more than ten drug screens, which he never attended except for the one in March 2021. When asked why HCJFS was requesting permanent custody regarding Father, Claggett stated:

> We do have concerns about his ability to care for the children and their basic needs, just based upon his job instability or lack of proof of income. We also have concerns about substance use due to one positive screen that he did have and the self-reporting of marijuana use. We also have concerns about his lack of bonding with the children because of the inconsistent visitation. And then also there is no DAF, so we don't really know if there's a mental health diagnosis. If there is, its currently going unaddressed, so we would have those concerns about his ability to care for children.

**{¶25}** Mother testified to a range of issues not relevant to this appeal, given that she is not a party.

### *Disposition, Objections, and Appeal*

**{¶26}** On November 14, 2022, the magistrate issued an order granting permanent custody to HCJFS. Regarding Father, the magistrate found that: (1) Father made negligible progress in his case plan; (2) Father did not use the rehabilitative services provided to help rectify any concerns and assume parental duties; (3) each parent went periods of 90 days without seeing the children; (4) the parents have a violent relationship; (5) Father admitted to using marijuana consistently; (6) both parents have not resolved the issues that caused the children to be removed; and (7)

Father had unaddressed substance-abuse issues. In the entry, the magistrate approved and adopted the various case plans that had been filed throughout the case.

**{¶27}** Father timely filed an objection to the magistrate's decision, and Mother filed a late objection. On March 9, 2023, the juvenile court denied both objections and entered judgment in favor of HCJFS. However, in *In re Y.H.*, this court reversed and remanded the case for the juvenile court to properly consider transcripts submitted by Father in support of his objection.

**{¶28}** The juvenile court issued a new order on September 6, 2023, upholding the decision of the magistrate to award permanent custody to HCJFS. In this regard, the juvenile court found that Father had made insignificant progress in his case plan by failing to complete diagnostic assessments, failing to complete drug screens, and inconsistently visiting the children. The juvenile court further found that there was clear and convincing evidence that the children could not be returned to Father pursuant to R.C. 2151.414(E). To support this finding, the juvenile court found that Father did not complete the case plan, tested positive in a drug screen, admitted to using marijuana frequently, and refused to separate his visits from Mother even though he acknowledged it placed the children at risk. The court noted that, in its observation, "Father lacks the capacity to protect his children from the harm that could result from Mother's behavior."

**{¶29}** Pursuant to the R.C. 2151.414(D) best-interest factors, the juvenile court found that the parents went periods of time exceeding 90 days without seeing the children; the children had been adjudicated abused, neglected, or dependent in 2021 and 2022; and the children could not be placed with the parents within a reasonable

time. The juvenile court accordingly found that an award of permanent custody to HCJFS was in Y.H.'s and B.H.'s best interest.

{¶30} Father timely appealed.

### *Sufficiency and Manifest Weight of the Evidence*

{¶31} Father raises one assignment of error: that the juvenile court erred and abused its discretion in granting permanent custody to HCJFS, which he argues was not supported by sufficient evidence, was against the manifest weight of the evidence, and was not in the children's best interest. In support of this alleged error, Father emphasizes two subarguments. First, Father asserts that the various case plans submitted for Y.H. and B.H. had not been approved and journalized by the juvenile court before permanent custody was granted. Therefore, he argues that the juvenile court erred in finding the children eligible for permanent custody under R.C. 2151.414(E)(1), which focuses on a parent's compliance with services to remedy the conditions that caused a child to be placed outside the home. Second, Father asserts that the children were never in the temporary custody of HCJFS, because the magistrate only placed them in "interim temporary custody." Thus, Father contends that the juvenile court erred in considering periods of interim custody in analyzing one of the best-interest factors, R.C. 2151.414(D)(1)(c), which references "temporary custody."

{¶32} Our review of the juvenile court's decision involving the termination of parental rights focuses on whether the court's decision was supported by clear and convincing evidence. *In re S & W*, 1st Dist. Hamilton Nos. C-230110 and C-230122, 2023-Ohio-2210, ¶ 11. "Clear and convincing evidence is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought

to be established." *Id*. Where competent and credible evidence exists to support the juvenile court's judgment, we will not substitute our judgment for that of the juvenile court. *Id*.

**{¶33}** Sufficiency and weight of the evidence are reviewed under slightly different standards.

> When examining the sufficiency of the evidence, we look to the adequacy of the evidence and determine whether some evidence exists on each element. When examining the weight of the evidence, we look to the inclination of the evidence and determine whether the greater amount of credible evidence supports one side rather than the other. In doing so, we must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether—in resolving the conflicts in the evidence—the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. We must also be mindful of the presumption in favor of the finder of fact.

(Internal citations and quotation marks omitted.) *Id*. at ¶ 12.

### *Case Plan and R.C. 2151.414(E) Placement Factors*

**{¶34}** We first address Father's claim that the lack of a journalized case plan is fatal to the juvenile court's award of permanent custody.

**{¶35}** HCJFS sought permanent custody as an original disposition for both Y.H. and B.H. To support such an outcome, the juvenile court must determine "(1) that the child cannot be placed with either parent within a reasonable time or should not be placed with the parent, using the factors set forth in R.C. 2151.414(E), and (2)

that permanent custody is in the best interest of the child based on the factors set forth in R.C. 2151.414(D)(1)." (Internal citations omitted.) *In re L Children*, 1st Dist. Hamilton No. C-220601, 2023-Ohio-1346, ¶ 12. R.C. 2151.414(E) contains 11 different factors for the juvenile court to assess to determine whether a child cannot or should not be placed with a parent. The juvenile court need only find that one factor disqualifies a parent as a placement to justify its permanent-custody determination under R.C. 2151.414(E). *Id* at ¶ 16.

{¶36} Here, the juvenile court found that Y.H. and B.H. could not and should not be placed with Father on the basis of four separate factors contained in R.C. 2151.414(E): (1) (E)(1), which looks at whether the parent has failed to substantially remedy the conditions that caused the child to be placed outside the home through case planning and services; (2) (E)(2), which considers, among other conditions, a parent's chronic chemical dependency that is so severe that it precludes a parent from providing a suitable home for the child now or within one year into the future; (3) (E)(4), which takes into account a parent's lack of commitment to a child; and (4) (E)(10), in which a parent has abandoned a child.

{¶37} Father argues that the juvenile court erred in applying (E)(1) and (E)(2) to him, because those factors rely upon case plans, and the case plans here were not properly journalized.

{¶38} We acknowledge that, as a matter of due process, when it comes to case plans, "[j]ournalization is key." *In re D.M.*, 1st Dist. Hamilton No. C-200043, 2020-Ohio-3273, ¶ 32. Nevertheless, the issue of whether the juvenile court erred with regard to its reliance upon the (E)(1) and (E)(2) factors or whether the case plans were

properly journalized below is immaterial, because the juvenile court need only find one factor under R.C. 2151.414(E) to support an award of permanent custody.

{¶39} We hold that the juvenile court's finding under R.C. 2151.414(E)(4) is adequate to support an award of permanent custody in this case. To that end, the juvenile court found that Father visited the children inconsistently throughout the case. The juvenile court also found that Father lacked the capacity to protect the children from Mother's harmful behavior and also failed to understand the potential safety risk Mother's conduct posed to the children.

{¶40} On appeal, Father asserts that, in making this determination, the juvenile court failed to address language in R.C. 2151.414(E)(4) regarding whether he was "able to" visit Y.H. and B.H. Father contends that his missed visits with the children were due to transportation and work issues and that, outside of those life events, he visited "when able to so." *See* R.C. 2151.414(E)(4) ("The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so * * *."). We view this argument as a challenge to the sufficiency of the evidence.

{¶41} Our review of the record reveals sufficient evidence to support the juvenile court's determination that Father demonstrated a lack of commitment to Y.H. and B.H. *See In re S & W*, 1st Dist. Hamilton Nos. C-230110 and C-230122, 2023-Ohio-2210, at ¶ 12. While we do not doubt Father's love for his children and desire to be present for them, the record shows that Father missed more visits than he attended. While Father testified to having transportation and work issues, those conflicts do not explain all of the missed visits.

{¶42} Moreover, Y.H. and B.H. both have significant medical needs that require the full attention and support of their caregivers. Father had ample opportunity to show that he would be willing to do what is necessary to support the children and their medical needs, and the record falls short of establishing that commitment. This, again, is not to cast doubt on Father's sincere love for his children. Genuine intention sometimes does not translate into actual action.

{¶43} R.C. 2151.414 (E)(4) also focuses on a parent's "other actions [that] show[] an unwillingness to provide an adequate permanent home for the child[.]" Here, too, we find ample evidence to support the juvenile court's finding. In this regard, the record demonstrates that Father lacked an adequate permanent home for Y.H. and B.H. For most of the time that the case was pending, HCJFS could not verify where Father was living. It was not until shortly before the dispositional hearing that Father secured housing. With regard to his proposed living situation, Father also had trouble understanding that Mother's turbulent behavior posed a safety risk to the children. Father testified that he wanted Mother, Father, Y.H., and B.H. to live together. But part of providing an "adequate permanent home" is ensuring a safe place for the children to reside, and this point seemed lost on Father as the case progressed.

{¶44} Given Father's spotty visitation history, inattention to Y.H.'s and B.H.'s medical needs, and inability to provide a safe permanent home for the children, the juvenile court's finding that permanent custody was appropriate under R.C. 2151.414(E)(4) was supported by sufficient evidence and was not against the manifest weight of the evidence. Because only one factor is needed under R.C. 2151.414(E) to justify an original disposition of permanent custody, we need not consider Father's arguments as to the case plan under R.C. 2151.414(E)(1) and (E)(2) or as to the validity

15

of the juvenile court's finding under R.C. 2151.414(E)(10).[2]  We uphold the juvenile court's determination that Y.H. and B.H. were eligible for an original disposition of permanent custody as to Father under R.C. 2151.414(E)(4).

*Temporary Custody vs. Interim Temporary Custody*

{¶45}  Next, we consider Father's argument that the children were never in the "temporary custody" of HCJFS, because the magistrate's orders throughout the case continuously placed them in "interim temporary custody."  Father argues that this difference in terminology matters because one of the best-interest factors under R.C. 2151.414(D)(1) focuses exclusively on periods of "temporary custody" rather than "interim temporary custody."  However, Father points to a distinction without a difference, as an examination of the statutes under which Y.H. and B.H. were placed in the care of HCJFS during the pendency of this case reveals that they were actually in temporary custody, regardless of the terminology used by the magistrate.

{¶46}  Relevant to permanent-custody cases, R.C. 2151.414(B)(1) provides that "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

{¶47}  Regarding Y.H., HCJFS filed for and was granted interim temporary custody on September 1, 2020.  Sixty days from that date is October 31, 2020.  Y.H. was subsequently adjudicated abused and dependent on January 6, 2021.  Thus,

---

[2] We acknowledge that the juvenile court's order is somewhat contradictory as to its determination that permanent custody was warranted under R.C. 2151.414(E)(10).  In determining whether Y.H. and B.H. could not and should not be placed with Father, the juvenile court found that Father abandoned the children under (E)(10) because he had gone more than 90 days without seeing them. On the other hand, in analyzing the best-interest factors under R.C. 2151.414(D)(1)(e), the juvenile court explicitly held that the (E)(7) to (E)(11) factors were inapplicable.  Because we uphold the juvenile court's finding under (E)(4), however, we need not resolve the contradiction below as to the applicability of the (E)(10) factor.

applying R.C. 2151.414(B)(1), Y.H. was in temporary custody as of October 31, 2020, or, at the very least, on January 6, 2021.

{¶48} Regarding B.H., HCJFS filed for and was granted interim temporary custody on October 1, 2021. Sixty days from that date is November 30, 2021. B.H. was subsequently adjudicated dependent on January 18, 2022. Again applying R.C. 2151.414(B)(1), B.H. was in the temporary custody of HCJFS on November 30, 2021, at the earliest or January 18, 2022, at the latest.

{¶49} We agree with Father that it would have been preferable for the magistrate to utilize the precise statutory terminology in granting temporary custody to HCJFS. This would have alleviated confusion as to the precise status of the children, which is important given that both eligibility for permanent custody and the best-interest factors consider a child's temporary-custody status. *See* R.C. 2151.414(B)(1)(d) and (D)(1)(C). Nonetheless, because the children were in temporary custody under R.C. 2151.414(B)(1), we reject Father's argument that the juvenile court erred in considering the periods of "interim temporary custody" in determining their best interest.

{¶50} Since the children were adjudicated dependent, R.C. 2151.353(A)(4) applies. Pursuant to R.C. 2151.353(A)(4), once a child is adjudicated abused, neglected, or dependent, a child can be placed in the permanent custody of an agency "if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child."

*Best-Interest Factors*

**{¶51}** Father's final argument is that the best-interest findings of the juvenile court are not supported by the record. R.C. 2151.414(D)(1) provides that when making a best-interest determination, the court shall consider all relevant factors, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child.

**{¶52}** Under R.C. 2151.414(D)(1)(a), the juvenile court found that the children had been in foster placement since birth. The juvenile court also found that the parents have shown that they clearly love their children. The juvenile court also found that both parents had gone 90 days or more without seeing the children, a reality that Father admitted. It is also undisputed that the children had never been in the home

or custody of Father. Having reviewed the record, and given Father's admission as to his absence from the children's lives, we cannot say that the trial court abused its discretion in reaching this finding.

**{¶53}** Under R.C. 2151.414(D)(1)(b), the juvenile court found that the children were too young to express their wishes. Father does not dispute this determination.

**{¶54}** Under R.C. 2151.414(D)(1)(c), the juvenile court found that the children had been in the temporary custody of HCJFS. As to Y.H., the juvenile court found that she had been in temporary custody since her adjudication date. As to B.H., the juvenile court noted he had been in interim custody since October 1, 2021, and was adjudicated on January 18, 2022. As we have discussed, we do not view the magistrate's use of different terminology to undermine the fact that the children were consistently placed outside of Father's care while this case was pending. The juvenile court did not abuse its discretion in considering that fact in taking the children's best interest into account.

**{¶55}** Under R.C. 2151.414(D)(1)(d), the juvenile court found that the children should not and could not be placed with either parent within a reasonable time, implying that neither parent offered Y.H. and B.H. a legally secure placement. On appeal, Father argues this was an abuse of discretion because he had stable housing at the time of the dispositional hearing. However, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. Given the evidence presented below, we cannot say that the juvenile court abused its discretion in weighing this factor in favor of permanent custody.

**{¶56}** Under R.C. 2151.414(D)(1)(e), the juvenile court found that none of the (E)(7) to (E)(11) factors applied. Thus, there is nothing for us to review in this regard.

**{¶57}** Considering the juvenile court's best-interest findings as a whole, and reviewing the record in light of Father's sufficiency and manifest-weight challenges, we cannot say that the juvenile court lost its way or created a manifest injustice in finding that permanent custody was in Y.H.'s and B.H.'s best interest.

### *Conclusion*

**{¶58}** After reviewing the record in this case, we hold that the juvenile court's judgment was supported by sufficient evidence and was not against the manifest weight of the evidence. The juvenile court's findings awarding permanent custody of Y.H. and B.H. to HCJFS under R.C. 2151.414(D) and (E) are clearly and convincingly supported by the record. We accordingly overrule Father's sole assignment of error and affirm the judgment of the juvenile court.

Judgment affirmed.

**CROUSE, P.J.,** and **WRINKLER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.