# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| IN RE: J.B. | : | APPEAL NOS. | C-250133 |
|  |  |  | C-250141 |
|  | : | TRIAL NO. | F/14/1148 Z |
|  | : | *JUDGMENT ENTRY* |  |

This cause was heard upon the appeals, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 6/18/2025 per order of the court.**

**By:**_____

      **Administrative Judge**

[Cite as *In re J.B.*, 2025-Ohio-2135.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| IN RE: J.B. | : | APPEAL NOS. | C-250133 |
|  |  |  | C-250141 |
|  | : | TRIAL NO. | F/14/1148 Z |
|  | : |  |  |
|  | : | *O P I N I O N* |  |

Appeals From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 18, 2025

*Jon R. Sinclair*, for Appellant Father,

*Alana Van Gundy,* for Appellant Mother,

*Connie Pillich,* Hamilton County Prosecuting Attorney, and *Patsy Bradbury,* Assistant Prosecuting Attorney, for Appellee Hamilton County Department of Job and Family Services,

*Raymond T. Faller,* Hamilton County Public Defender, and *Allison Smith*, Assistant Public Defender, for Appellee Guardian Ad Litem.

**BOCK, Presiding Judge.**

**{¶1}** In these consolidated appeals, Mother and Father challenge the juvenile court's grant of permanent custody of J.B. to the Hamilton County Department of Job and Family Services ("HCJFS"). In separate assignments of error, both parents challenge the sufficiency and weight of the evidence.

**{¶2}** We overrule those assignments of error. Affidavits in the evidence and caseworker testimony show that the parents persist in patterns of domestic violence. And Mother's testimony, combined with visitation records, reveals a more-than-three-month absence of the parents from J.B.'s life. This constitutes clear and convincing evidence supporting the juvenile court's finding that J.B. could not or should not be placed with her parents. And clear and convincing evidence supports the juvenile court's conclusion that awarding HCJFS permanent custody is in J.B.'s best interest.

**{¶3}** We affirm the juvenile court's judgment.

## I. *Factual and Procedural History*

**{¶4}** Mother and Father have three children together. J.B., the youngest, was born in November 2019.

**{¶5}** Roughly five years before J.B. was born, HCJFS filed for custody of Mother and Father's two older children, Ja.B. and Jo.B. In 2018, the juvenile court awarded HCJFS permanent custody of Ja.B. and Jo.B. based on Father's lack of engagement with case-plan services, Mother's lack of "insight into her mental illnesses," Mother's "belief that she does not need psychiatric care or counseling," and Mother's "abusive relationship with Father."

**{¶6}** We affirmed that decision on appeal, reasoning:

The record contains sufficient evidence to support the juvenile court's finding under R.C. 2151.414(E) that the children cannot be placed with

either parent within a reasonable time and should not be placed with either parent. *See In re W.W.*[,2011-Ohio-4912,] ¶ 46 [1st Dist.]. Both parents failed continuously and repeatedly to substantially remedy the conditions that caused the children to be placed outside the home. *See* R.C. 2151.414(E)(1). Both parents suffer from chronic mental illness, and father suffers from chronic substance abuse, which prevented the court from safely placing the children with either of them within a reasonable time. *See* R.C. 2151.414(E)(2). In addition, the parents continued to maintain their abusive relationship despite their history of domestic violence.

Father did not engage in mental-health or substance-abuse treatment, nor did he complete an anger-management program, all required by his case plan. He did not submit to drug screening and reported that he continued to use marijuana and crack. Although mother completed a required domestic-violence course, she refused to make behavioral changes and continued to engage in aggressive behavior. Mother was discharged unsuccessfully from a parenting course because she failed to attend the coaching component of the course. Although mother had recently obtained housing, her caseworker had not been able to locate her or father for a two-month period after J[o.B.]'s birth.

*In re B. Children,* 2018 Ohio App. LEXIS 2129, *2-3 (1st Dist. May 18, 2018).

**A. First complaint**

{¶7} In August 2022, HCJFS moved for permanent custody of J.B., alleging that J.B. was dependent under R.C. 2151.04. HCJFS based its dependency allegation

on both parents' history of domestic-violence allegations and charges, which prompted HCJFS to investigate in July 2022. HCJFS noted in its complaint and an affidavit that Mother and Father fled with J.B. during the July 2022 investigation. While Mother and Father initially allowed a HCJFS employee into their apartment, the parents asked the caseworker "to leave before the assessment was completed."

**{¶8}** HCJFS requested interim custody of J.B. and a determination that reasonable efforts were not required. The magistrate placed J.B. in HCJFS's interim custody and found that reasonable efforts were not required.

**{¶9}** In early November 2022, HCJFS filed a case plan. To alleviate the "risk of harm" caused by J.B.'s caregivers' "out of control behavior, untreated mental health, substance abuse and domestic violence," HCJFS wanted Mother and Father to demonstrate impulse control and self-control, "identify coping mechanisms that [Father] can use when he become[s] escalated to avoid engaging in violent and out of control behavior," and remove themselves from "volatile environments and refrain from domestically violent and/or physically aggressive behavior." But due to the magistrate's no-reasonable-efforts finding, HCJFS would "not be facilitating any case plan services." HCJFS also identified Mother's and Father's regular attendance at visitation and appropriate behavior as action steps for Mother and Father.

### B. Second complaint

**{¶10}** In December 2022, HCJFS moved to dismiss the permanent-custody complaint because the 90-day deadline for holding the dispositional hearing had lapsed. So, HCJFS refiled its complaint for permanent custody of J.B. based on domestic-violence allegations in July 2022, and Mother and Father's flight during HCJFS's investigation. The complaint noted that J.B. was "significantly delayed in speech development and has been diagnosed with Thalassemia." It also noted that

Mother and Father "went six weeks without seeing the child" and neither parent engaged in domestic-violence services.

**{¶11}** The magistrate awarded HCJFS interim custody of J.B. the following day, finding that HCJFS "made reasonable efforts to prevent removal from the home by provision of the following services: diagnostic assessment, visitation, domestic violence services, mental health treatment, and case management."

**{¶12}** In January 2023, the magistrate adjudicated J.B. dependent as defined by R.C. 2151.04(D)(1)-(2). The magistrate found that Mother and Father "have a history of behavior which resulted in an adjudication of a sibling for abuse, neglect, or dependency," and "the circumstance in the siblings' case are congruent to [J.B.]'s case, in that parents have unresolved domestic violence and mental health issues, and are living together." Police had responded to the family residence in July 2022 to investigate domestic violence when J.B. was present. "Mother presented with a black eye," Mother and Father fled as HCJFS sought an emergency order, and J.B. was found two weeks later at a relative's home.

**{¶13}** HCJFS filed a case plan and wanted Mother and Father to seek mental-health treatment, but HCJFS made clear it would not be facilitating any services.

### C. Disposition hearing

**{¶14}** The magistrate held disposition hearings on February 8, August 9, September 6 and 27, 2023, and April 17, 2024. HCJFS built its permanent-custody case on testimony from Allison Beresford (J.B.'s HCJFS caseworker), Mother, and Father. It supplemented that testimony with visitation records and both parents' criminal-history records.

1. *J.B.'s relationships*

**{¶15}** Beresford started working on J.B.'s case in the summer of 2022. She explained that J.B. is bonded with Mother—J.B. would "run to [Mother] and give her a hug" when she saw her during visits, "and Mo[ther] is very affectionate towards her." Further, Beresford testified that Father was "positive" with J.B. and was bonded with J.B.—though that bond was weaker than Mother's bond with J.B. Beresford also saw a bond between J.B. and her foster parents.

**{¶16}** Beresford explained that HCJFS filed its complaint due to "ongoing domestic violence between [Mother] and [Father]." HCJFS was concerned with Mother's and Father's criminal histories, domestic-violence issues, "out-of-control behavior," untreated mental-health issues, and inconsistent visitation.

**{¶17}** Mother, Father, and J.B. were living in Avondale when HCJFS became involved. Mother testified that she took J.B. and "went to Sharonville" because her Avondale apartment lacked heat and air conditioning. Father was unsure why HCJFS "took" J.B. but later recalled that HCJFS removed J.B. "because of AC, an AC problem." Father testified that an HCJFS worker visited Mother's residence, and Mother and Father asked for assistance with getting an air conditioner. But the agency worker "came back down and said we got to take J[.B]." Mother and Father told the agency worker they were leaving and "walked out in front of [her] face."

**{¶18}** Mother and Father both denied having mental-health or domestic-violence issues. Mother testified that she attended therapy and completed domestic-violence classes when HCJFS pursued permanent custody of J.B.'s older siblings. Mother denied having ever called the police as a victim of domestic violence. Though she described the forms of domestic violence and the steps that a victim can take to escape an abusive relationship. Father recalled taking a diagnostic assessment during

7

J.B.'s siblings' case. He initially participated in mental-health services as required by the case plan, but he had "a lot of things going on." So, he disengaged. While he expressed frustration over the lack of case-plan services offered by HCJFS, Father testified that he does not need mental-health or domestic-violence services.

2. *Domestic violence*

{¶19} Mother and Father both testified that domestic violence was not an issue in their relationship. Mother denied having been arrested for domestic violence in 2014, 2015, 2016, or 2023, and for assault in 2020. HCJFS, however, entered Mother's criminal records into the evidence, which revealed that Mother was arrested and convicted of domestic violence in 2015 and 2023, and of assault in 2020.

{¶20} Mother and Father both testified that Father has been convicted of domestic violence. But they asserted that their other convictions were the product of false accusations. Father explained that Mother and he would get into verbal disagreements and resort to "childish" means for revenge. Father testified that the two had "been through a lot." In the beginning, they resorted to calling police to avoid arguments and exert control over their relationship. Father admitted that his infidelity created issues early in the relationship and "the only way [he] could keep it together was to make her look crazy." And he did that by calling the police.

{¶21} Mother testified that calls to the police were a de-escalation tactic. But neither cooperated with the prosecution, so some charges were dropped. Mother explained, "You can call the police anywhere. . . . People do it all the time. It ain't no big deal."

{¶22} Father, like Mother, downplayed the false accusations. During their 12-year relationship, Father had fabricated allegations "four or five" times. But Mother and Father "did it to each other." He was unsure how many times Mother fabricated

8

allegations against him because he has children with seven women, and therefore, he is "dealing with seven women everyday." He explained, "It's something that we both know that we can hurt each other. So we call the police on each other and make up stupid things and – which is petty, but it's something that ain't stopped, you know." According to Father, the two have come to realize that "[a]rguing ain't going to solve" their problems, "[a]ttacking each other ain't going to solve it."

{¶23} Beresford recalled a May 2023 phone call with Mother, where Beresford "could hear [Father] yelling and screaming" at Mother, though she could not "hear exactly what he was saying to her." While Mother "had locked herself in the room that she was in, her and [J.B.] to be in at the time," Mother assured Beresford that "she was safe and didn't need [Beresford] to call anyone." Mother informed Beresford that Father "was not currently receiving any mental health treatment" and Mother "mentioned something about wanting a temporary protection order." Beresford directed Mother to a domestic-violence center, but Mother did not follow through.

{¶24} Beresford also recalled that, in July 2023, "[Mother] was charged with domestic violence against [Father]." Beresford explained that "there was a knife involved and [Mother] had attempted to assault [Father] while he was asleep." The evidence includes a July 2023 affidavit signed by Father stating that Mother "came in the room after police left we were told to separate I did I went to sleep after [a]bout 10 min she came in the room with a butcher knife and tried to stab me in my sleep."

{¶25} Mother testified that she had been arrested for disorderly conduct rather than domestic violence and denied trying to stab Father. Mother explained that Father's 23-year-old child was involved in an "altercation" with a neighbor, which turned into a "big ole group fight." Mother tried to de-escalate the situation as the

police arrived. But she was arrested because she "fought the neighbor." Afterwards, Mother and Father "got into a debate," and "got into it" as the two "debated."

**{¶26}** Father explained that he was upset that his son "got beat up," so he "took it out on [Mother] and made up a fabricated ass story that she stabbed the bed." At another point, he testified that he called the police on Mother in July after they got into an argument over something "petty," like laundry, and Father wanted to sleep. Father called the police repeatedly until they came to arrest Mother. He felt regret the next morning.

**{¶27}** Father also described a time when Mother called the police when his oldest son threatened to "kill" Mother and J.B. in response to Mother asking the son to clean a room. Father was not worried because his son has a "mental condition," is prone to outbursts, and is not violent. Mother testified that she ignored his threat, as Father's oldest son just "say[s] stuff" and Mother is "used to that." Mother clarified that the son was upset because he could not see J.B., so his outburst was "completely understandable." Father testified that his oldest son came over to the house "all the time." Yet, Mother testified that Father's oldest son had not been back to Mother's house since that incident. Father also explained that his oldest son's girlfriend was arrested near, but not in, Mother's house after she "pulled a knife out" on his son.

*3. Visitation*

**{¶28}** Beresford described Mother's and Father's visitation with J.B. as "inconsistent." In 2023, supervised visitation took place at HCJFS because Mother had resisted completing the intake paperwork for Family Nurturing Center. Beresford explained that Mother and Father visited Ja.B. and Jo.B. at Family Nurturing Center and Mother was concerned that employees would hold biases against the family.

Beresford described Mother's and Father's interactions with J.B. during those visits as positive and a reflection of a bond between J.B. and both Mother and Father.

**{¶29}** But Beresford recalled that Mother and Father had "several missed visits and periods of time where parents were not visiting." There were "nine either no-shows by the parents or they arrived after the 14-minute window whereby we cancelled the visit." Father told Beresford that he missed a visit because of a court date, and Mother reported transportation issues. HCJFS attempted to help the parents with bus passes, but Mother asked for bus tickets "on demand, and they're not always immediately available." Other times, Mother cancelled visits with J.B. because of her work schedule. While HCJFS rescheduled those visits, "Mother missed [some] follow-up visit[s] as well." According to Beresford, both Mother and Father were reactive and "escalated verbally" when they learned that their visits had to be cancelled.

**{¶30}** Mother and Father eventually completed the Family Nurturing Center intake forms but only visited J.B. at Family Nurturing Center once on June 15, 2023. According to Beresford, Father's oldest son's unauthorized presence at that visit created an issue. Mother and Father both described feeling uncomfortable that a male staff member took J.B. to the bathroom. And both described feeling unsafe at Family Nurturing Center due to its location.

**{¶31}** HCJFS ultimately referred the family to JusticeWorks in July 2023. Mother and Father were placed on a waitlist, and Beresford asked Mother to continue visiting J.B. at Family Nurturing Center. Mother insisted that visitation return to HCJFS, but that was not possible. At the September 27, 2023 hearing, Mother testified that the Family Nurturing Center visit was "the last time" she had seen J.B.

**{¶32}** Father testified in April 2024 that visitation had been going well at JusticeWorks until he was "shot randomly out of nowhere" in December 2023. Father was bedridden for two months and the family returned to the waitlist.

**{¶33}** Following the April 2024 hearing, the magistrate issued her decision granting permanent custody of J.B. to HCJFS. Mother and Father objected. After conducting an independent review of the issues and evidence, the juvenile court overruled Mother's and Father's objections, and "accepted and approved" the magistrate's decision as the decision of the juvenile court, and awarded HCJFS permanent custody of J.B.

## II. *Analysis*

**{¶34}** Both Mother and Father challenge the juvenile court's awarding HCJFS permanent custody of J.B., arguing that the juvenile court's decision is supported by insufficient evidence and is against the manifest weight of the evidence.

### A. *Appellate review in permanent-custody cases*

**{¶35}** Under R.C. 2151.353(A)(4), a juvenile court may award a child-services agency permanent custody of a child who has been adjudicated dependent if the juvenile court makes two findings. First, it must find, "by clear and convincing evidence, that [] the child cannot be placed with the parents within a reasonable time or should not be placed with the parents." *In re K.H.,* 2024-Ohio-5292, ¶ 12 (1st Dist.). Second, it must find, by clear and convincing evidence, that "permanent custody is in the child's best interest." *Id.*

**{¶36}** Clear and convincing evidence is a "'degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases.'" *In re Z.C.,* 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

When a statute requires clear and convincing evidence, we review a lower court's judgment and findings under sufficiency and manifest-weight standards. *Id*. at ¶ 11.

**{¶37}** To review the sufficiency of the evidence, a reviewing court "must assess whether the facts, record evidence, and inferences supporting the juvenile court's disposition were adequate to sustain the juvenile court's statutory determinations." *In re S/F Children*, 2025-Ohio-822, ¶ 36 (1st Dist.), citing *In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.). This court defers to the juvenile court's factual determinations when competent, credible evidence supports them. *Id.,* quoting *In re A.Y.C.*, 2023-Ohio-4494, ¶ 34 (1st Dist.).

**{¶38}** We will reverse a decision as against the manifest weight of the evidence only if we determine that the juvenile court's judgment "created 'a manifest miscarriage of justice.'" *Id*. at ¶ 38, citing *In re B.J.*, 2021-Ohio-373, ¶ 14 (1st Dist.). We review the entire record to determine if the juvenile court "lost its way . . . in resolving conflicts in the evidence." *Id.,* quoting *In re B.J*. at ¶ 14. In other words, the juvenile court's permanent-custody decision will not be reversed if the record contains "competent, credible evidence that the essential statutory elements for permanent custody have been established by clear and convincing evidence." *In re C.L.,* 2023-Ohio-462, ¶ 29 (8th Dist.).

## B.  *J.B.'s placement with Mother or Father*

**{¶39}** A juvenile court must consider the 16 enumerated factors listed in R.C. 2151.414(E), and "all relevant evidence," when determining if a child adjudicated dependent "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent." R.C. 2151.353(A)(4); *see* R.C. 2151.414(E). The juvenile court may rest its determination that a child cannot or should not be placed with either parent on a finding that a single R.C. 2151.414(E) factor exists. *See*

*In re Z.F.,* 2024-Ohio-1698, ¶ 41 (1st Dist.).

**{¶40}** Here, the magistrate and juvenile court relied on R.C. 2151.414(E)(1), (4), (10), and (11) to find that J.B. could not or should not be placed with either Mother or Father.

1.  *Remedying the conditions that caused J.B.'s removal*

**{¶41}** Under R.C. 2151.414(E)(1), the juvenile court had to consider whether Mother and Father, despite HCJFS's reasonable case planning and efforts to assist them, "failed continuously and repeatedly to substantially remedy the conditions" that initially caused J.B.'s placement outside the home. The juvenile court must consider whether, and to what extent, the parents used services made available to help them change their conduct and "maintain parental duties." R.C. 2151.414(E)(1).

**{¶42}** The juvenile court found that Mother and Father failed to remedy their domestic-violence and mental-health issues. The magistrate cited Father's failure to engage with case-plan services related to J.B.'s older siblings and noted, "Due to the history of the other children, HCJFS was relieved from [its] obligation to provide reasonable efforts to reunify the family."

**{¶43}** But "'a case plan relating to a prior matter cannot be used to satisfy [R.C. 2151.414(E)(1)] where the agency seeks permanent custody as the initial disposition.'" *In re B.S.,* 2018-Ohio-4645, ¶ 65 (4th Dist.), quoting *In re Ward,* 2000 Ohio App. LEXIS 3519, *5 (4th Dist. Aug. 2, 2000). That is so because R.C. 2151.414(E)(1)'s focus "is on the efforts made to remedy the problems after the child is removed from the home." *In re B.S.* at ¶ 61, quoting *In re Ward* at *5. We note that several Ohio courts have questioned reliance on R.C. 2151.414(E)(1) when an initial complaint seeks permanent custody of the child and the child-services agency does not provide the parent with an opportunity to rectify the cause for removal. *See In re B.B.,* 2021-Ohio-

2299, ¶ 51 (10th Dist.); *see also In re Destiny C.,* 2008-Ohio-5292, ¶ 25 (6th Dist.); *In re B.S.* at ¶ 61. While there was a case plan filed for the parents in this case, HCJFS's efforts fell short of the diligent efforts referenced by the statute.

**{¶44}** But we do not have to consider whether R.C. 2151.414(E)(1) applies because there is clear and convincing evidence that other statutory factors applied to J.B.'s case. And "[a] proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be reunited." *In re Destiny C.* at ¶ 25.

2. *Mother's and Father's commitment to J.B.*

**{¶45}** Under R.C. 2151.414(E)(4), a child cannot or should not be placed with either parent within a reasonable time where clear and convincing evidence shows that the parents lack commitment toward the child, evidenced by their failure to regularly "support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."

**{¶46}** The magistrate found that Mother and Father failed to engage in services or demonstrate behavioral changes necessary for a safe reunification. Plus, she found that Mother and Father repeatedly abandoned J.B. As for the juvenile court, it cited Mother's and Father's inconsistent visitation and failure to remedy the issues that brought J.B. into HCJFS's care.

**{¶47}** Infrequent visitation with a child can establish a parent's lack of commitment. *See In re Y.H.,* 2023-Ohio-4554, ¶ 41 (1st Dist.). In *In re Y.H.,* this court determined that R.C. 2151.414(E) had been satisfied when "Father missed more visits than he attended [and] [w]hile Father testified to having transportation and work issues, those conflicts do not explain all of the missed visits." *Id.* Plus, we cited Y.H.'s father's "trouble understanding that Mother's turbulent behavior posed a safety risk

to the children" as evidence of his "unwillingness to provide an adequate permanent home for the child." *Id.* at ¶ 63.

**{¶48}** Similarly, a lack of commitment has been found when "parents attended approximately half of the scheduled visits with their son," the parents never progressed to unsupervised visits, the parents were uncooperative with service providers, and the parents failed to inform the agency of the father's conviction and jail sentence. *See In re G.K.,* 2008-Ohio-5442, ¶ 18 (9th Dist.).

**{¶49}** Following a review of the record, we conclude that the juvenile court's findings are supported by sufficient evidence and the manifest weight of the evidence.

**{¶50}** Beresford described Mother's and Father's lack of consistent visits with J.B. at HCJFS. She explained that Mother and Father resisted filling out the Family Nurturing Center intake forms, which delayed visitation with J.B. And the parents refused to continue visitation at Family Nurturing Center when they were placed on a waitlist at a different visitation center. Plus, Mother testified in late September 2023 that she had not seen J.B. since the June 15, 2023 Family Nurturing Center visit. In other words, Mother and Father went more than three months without seeing J.B.

**{¶51}** Testimony and police reports support the juvenile court's finding that Mother and Father failed to address domestic-violence concerns. Beresford described a phone call where Mother had locked herself in a room with J.B. because Father was "screaming" at Mother. Father signed an affidavit describing Mother's attempt to stab him with a butcher knife in his sleep. And both Mother and Father minimized Father's son's threat to kill Mother.

**{¶52}** Mother and Father both testified that the domestic-violence charges and convictions were the product of a cycle of mutual retaliation, with each falsely accusing the other of domestic violence as a form of revenge. The magistrate, however,

16

rejected those explanations as incredible. The magistrate's ability to see and hear both Mother's and Father's testimony warrants deference. *See State v. Carson,* 2019-Ohio-4550, ¶ 16 (1st Dist.).

3. *Abandonment*

**{¶53}** Under R.C. 2151.414(E)(10), the juvenile court shall find that the child cannot or should not be placed with either parent where clear and convincing evidence shows that the child has been abandoned. A child is abandoned where the parents did not visit or maintain contact with the child for more than 90 days, even if the parents later resume contact with the child. *In re P/W Children,* 2020-Ohio-3513, ¶ 31 (1st Dist.), quoting R.C. 2151.011(C).

**{¶54}** The magistrate identified three 90-day periods without contact between the parents and J.B.: (1) before Mother and Father's June 2023 visit at Family Nurturing Center; (2) from the Family Nurturing Center visit to the end of September 2023; and (3) from December 2023 to April 2024. The juvenile court cited the second and third periods of time to find that Mother and Father abandoned J.B.

**{¶55}** Sufficient clear and convincing evidence supports the juvenile court's abandonment finding. On September 27, 2023, Mother testified that the last time she had visited with J.B. was at the Family Nurturing Center. Exhibits show that this visit occurred on June 15, 2023, more than 90 days before Mother testified. When Mother and Father were placed on a waitlist for visitation at JusticeWorks, they refused visitation at Family Nurturing Center. This evidence also shows that the juvenile court's finding on abandonment is consistent with the weight of the evidence.

4. *A legally secure permanent placement and adequate care for J.B.*

**{¶56}** The final statutory factor cited as evidence that J.B. cannot and should not be returned to Mother and Father is their inability to provide a legally secure

permanent placement. Under R.C. 2151.414(E)(11), juvenile courts are required to find that a child cannot and should not be placed with either parent when (1) parental rights were "involuntarily terminated with respect to a sibling"; and (2) the parents "failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, [they] can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." R.C. 2151.414(E)(11).

**{¶57}** Under the statute, a prior involuntary termination of parental rights creates a rebuttable presumption of unfitness. *In re A.W.,* 2022-Ohio-3715, ¶ 23 (1st Dist.). The parents have the burden of proving that they can provide a legally secure placement for the child. *Id.* at ¶ 24. A legally secure placement includes "'"a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."'" *Id.* at ¶ 23, quoting *In re A.D.,* 2022-Ohio-2346, ¶ 20 (1st Dist.), quoting *In re D.V.,* 2022-Ohio-1024, ¶ 30 (1st Dist.).

**{¶58}** There is no dispute that the juvenile court awarded HCJFS permanent custody of J.B.'s older siblings. The magistrate found that Mother and Father cannot provide a legally secure permanent placement and adequately care for J.B.'s health, welfare, and safety because of Mother's and Father's untreated mental-health issues and persistent domestic-violence issues. The juvenile court also cited Mother's and Father's failures to remedy the conditions that brought J.B. into HCJFS's custody.

**{¶59}** Mother argues that the evidence proved that she has a stable income and residence. She also points to her testimony describing what she learned from the domestic-violence services, demonstrating her understanding of the need to remove herself from unsafe environments.

**{¶60}** Mother further argues that HCJFS failed to satisfy its burden under this factor, but R.C. 2151.414(E)(11) shifts the burden to the parent to rebut the

presumption created by the previous termination of parental rights over a sibling. *See In re A.W.,* 2022-Ohio-3715, at ¶ 24 (1st Dist.).

**{¶61}** Father points to his and Mother's adequate housing and income to support J.B. He explains that the domestic-violence issue is not a true reflection of their parental ability and relationship because the concerns are the product of false reports to the police.

**{¶62}** But the juvenile court's findings are supported by sufficient evidence and not against the manifest weight of the evidence. As discussed, the magistrate found that Mother's and Father's explanations of the domestic-violence charges were incredible. The affidavits in the record undercut Mother's and Father's claims of their ability to provide a stable, legally secure permanent placement.

**{¶63}** In sum, there is sufficient clear and convincing evidence supporting the juvenile court's findings that Mother and Father (1) demonstrated a lack of commitment to J.B., (2) abandoned J.B., and (3) failed to prove that they can provide a legally secure placement for J.B. under R.C. 2151.414(E)(4), (10), and (11). Moreover, those findings are consistent with the weight of the evidence. Because these factors are present, the juvenile court appropriately found that J.B. cannot and should not be placed with either Mother or Father.

## C. *J.B's best interest*

**{¶64}** Turning to the second prong of our inquiry, we note that Father did not challenge the juvenile court's best-interest findings. Therefore, based on our holding in section B above, we overrule Father's assignment of error and confine our consideration of the best-interest factors to Mother's arguments.

**{¶65}** In all custody matters, the child's best interest is paramount. *See In re D.A.,* 2007-Ohio-1105, ¶ 11. A court determining a child's best interest must consider

the factors enumerated under R.C. 2151.414(D)(1) and all other relevant factors. *In re A.M.*, 2020-Ohio-5102, ¶ 19. No single factor controls the best-interest analysis. *See In re Schaefer*, 2006-Ohio-5513, ¶ 56. Rather, the best interest of a child reflects the totality of the circumstances. *See In re N.R.S.,* 2018-Ohio-125, ¶ 16 (3d Dist.).

**{¶66}** R.C. 2151.414(D)(1)'s best-interest factors are:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child . . . ;

(c) The custodial history of the child . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

**{¶67}** Mother first argues that the juvenile court failed to discuss each statutory factor. But the Supreme Court of Ohio has made clear that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.,* 2020-Ohio-5102, ¶ 31. While "it is preferable for a juvenile court to provide some discussion or analysis of the best-interest factors to aid in appellate review and to increase confidence in its decision, [] the statute itself requires only that the court consider those factors." *Id.* at ¶ 42. Plus, the only factor absent from the juvenile court's R.C. 2151.414(D)(1) analysis is "[w]hether any of the factors in divisions (E)(7) to (11) of this section apply in

relation to the parents and child." R.C. 2151.414(D)(1)(e). The juvenile court's findings concerning whether J.B. could not or should not be placed with Mother or Father were based on its "consideration of all factors" and its findings under R.C. 2151.414(E)(10) and (11). So, the juvenile court did consider R.C. 2151.414(E)(7) to (11), which is all that the statute requires.

**{¶68}** The juvenile court's best-interest findings began with recognizing J.B.'s bond with Mother and Father. *See* R.C. 2151.414(D)(1)(a). But it determined that Mother's failure to remedy the conditions that prompted J.B.'s removal from the home demonstrated that a legally secure permanent placement could not be achieved without awarding HCJFS permanent custody of J.B. *See* R.C. 2151.414(D)(1)(d).

**{¶69}** Mother argues that there is no evidence that she cannot parent or protect her child, or that J.B. was in danger in Mother's care. But as discussed, Beresford's description of the phone call with Mother and the affidavits in the record constitute sufficient clear and convincing evidence of Mother's and Father's ongoing domestic-violence issues. And the juvenile court's decision is not against the manifest weight of the evidence simply because it did not believe Mother's and Father's testimony. *See In re B.O.J.*, 2010-Ohio-791, ¶ 8 (10th Dist.).

**{¶70}** Therefore, we overrule Mother's assignment of error.

### III. Conclusion

**{¶71}** We overrule Mother's and Father's assignments of error and affirm the juvenile court's award of permanent custody of J.B. to HCJFS.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.